**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| **STEFANIE BURRELL** | : | |
| **8451 Cope Highway** | : | |
| **Hague, VA 22469** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No.:** |
| | : | |
| **v.** | : | **JURY DEMAND** |
| | : | |
| **ALICIA SHEPARD** | : | |
| **500 Indiana Avenue, NW** | : | |
| **Washington, DC 20001** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DANIEL W. CIPULLO** | : | |
| **500 Indiana Avenue, NW** | : | |
| **Washington, DC 20001** | : | |
| | : | |
| **and** | : | |
| | : | |
| **THE DISTRICT OF COLUMBIA** | : | |
| **A Municipal Corporation** | : | |
| **441 Fourth Street, NW** | : | |
| **Washington, DC 20001** | : | |
| | : | |
| **SERVE:** | : | |
| **The Honorable Muriel Bowser** | : | |
| **Executive Office of the Mayor** | : | |
| **1350 Pennsylvania Avenue, N.W.** | : | |
| **Suite 316** | : | |
| **Washington, DC 20004** | : | |
| | | |
| **Karl A Racine, Attorney General for** | : | |
| **The District of Columbia** | : | |
| **441 Fourth Street, NW Suite 650** | : | |
| **Washington, DC 20001** | : | |
| **Defendants.** | : | |

==============================

## COMPLAINT

Plaintiff, STEFANIE BURRELL, by and through undersigned counsel, Billy L. Ponds, of The Ponds Law Firm, respectfully submits this Complaint against Alicia Shepard, Daniel Cipullo and the District of Columbia. In support of her claims, Plaintiff Stefanie Burrell states as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(4), the Fifth Amendment of the United States Constitution, the Civil Rights Act of 1964 (Title VII, 42 U.S.C. §2000e-2), and 42 U.S.C. §1983. The amount of controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this court.

2.      Plaintiff Stefanie Burrell ("Burrell") brings this action to redress the defendants' deprivation of rights secured to plaintiff pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000(e)), the Fifth Amendment of the United States Constitution, 42 U.S.C. §1983, D.C. Code §2-1402.01 (DCHRA).

3.      Burrell is filing her complaint with this court within ninety (90) days of receipt of the U.S. Equal Opportunity Employment Commission Dismissal and Notice of Rights letter dated and issued on June 22, 2017.

4.      Plaintiff submits that this Court has jurisdiction over all claims for relief cited herein.

5.      All of the acts complained of herein occurred in the District of Colombia.

6.      Venue is proper in this Court as set forth herein.

## PARTIES

7.      Burrell is an African-American female over the age of eighteen who served as Calendar Coordinator in the Quality Assurance Branch of the Criminal Division of the Superior Court of the District of Columbia.

8.      The District of Columbia is a municipality with the authority to sue and be sued and, among other things, is responsible for the operation of the Superior Court of the District of Columbia ("DC Superior Court") as an agency of the local government.

9.      At all times relevant herein, Alicia Shepard ("Shepard") and Daniel Cipullo ("Cipullo") were employed by the District of Columbia, specifically by the Superior Court of the District of Columbia.

10.     At all times relevant herein, Shepard was the Branch Chief of the Criminal Division.

11.     At all times relevant herein, Cipullo was the Director of the Criminal Division.

12.     At all times relevant herein, Shepard and Cipullo were acting within the scope of their employment.

13.     Shepard and Cipullo are being sued in their official and individual capacities.

## FACTS

14.     Burrell commenced employment with the Superior Court of the District of Columbia as a Court Aid on May 2, 1992.

15.     At the time Burrell was hired, she earned $16,000 per year.

16.     Burrell most recently served as a Calendar Coordinator in the Quality Assurance Branch of the Criminal Division of the Superior Court of the District of Columbia until her employment there ended in November 2016.

17.     As a Calendar Coordinator, Burrell's salary was $69,000 per year.

18.     Burrell served as a DC Superior Court employee for more than twenty years.

19.     Burrell has suffered from an ongoing pattern of discrimination toward African-American employees of the DC Superior Court Criminal Division.

20.     Shepard, Cipullo, Antoinette Lockett ("Lockett"), Supervisor of the Quality Assurance Branch of the DC Superior Court, and Court Security Officer (CSO) Claire, all facilitated discriminatory actions against Burrell and other African-American employees.

21.     At all times relevant herein, Shepard was Burrell's immediate Branch Chief.

22.     On the morning of Monday, July 25, 2005, CSO Claire made a sexual derogatory remark that made Burrell feel extremely uncomfortable.

23.     Upon information and belief, CSO Claire targeted Burrell because she was an African-American female.

24.     Burrell reported this incident to CSO Claire's immediate supervisor, Louise Epps ("Epps"), Anne Wicks ("Wicks") and the honorable Chief Judge Rufus King.

25.     When Burrell spoke with Epps, she repeatedly implied that Burrell had in some way provoked the comment, and focused the questioning on Burrell's conduct and whether or not Burrell ever had any prior contact or relations with CSO Claire.

26.     Despite the reported incident involving CSO Claire's misconduct toward Burrell, Epps subsequently promoted CSO Claire to supervisor.

27.     Stanley Booker ("Booker"), a former CSO at DC Superior Court, contacted Burrell regarding her complaint and informed Burrell of a complaint that he had previously filed regarding CSO Claire.

28.     Booker was ultimately terminated, upon information and belief in retaliation for his complaint and other concerns he had repeatedly raised regarding CSO Claire.

29.     Nothing else was done until approximately eight (8) years after the incident, when Rich Parrish ("Parrish") contacted Burrell and arranged for investigator Arthur Khan ("Khan") to interview Burrell.

30.     Burrell provided Khan with a statement and answered his brief questions, but upon information and belief nothing was done regarding the complaint.

31.     Burrell's complaint was not a one-time isolated incident involving sexual harassment and misconduct by CSO Claire.

32.     Burrell is aware of at least two (2) other incidents that were reported to management and others with the authority to address the harassment, but no action was taken regarding these complaints.

33.     On or about March 23, 2016, at approximately 11:40 am, Shepard recorded a video on her cell phone at the DC Superior Court.

34.     In the aforementioned video, Shepard was on the first floor at the main entrance of the courthouse.

35.     In the aforementioned video, Shepard included her own commentary as she was filming.

36.     Shepard did not seek or obtain permission from the Court to film a video on her personal cell phone.

37.     Shepard did not seek or obtain consent from the individuals she filmed who were working at the Court, including but not limited to, Burrell.

38.     Shepard's unauthorized video recording within the DC Superior Court is a clear and direct violation of DC Superior Court workplace policies, which prohibit filming of any kind without prior consent and permission.

39.     In the video recording, Shepard states, "This is all I rule. I rule over all of this".

40.     In the video, Shepard makes disparaging comments about the work ethic of her subordinates in the Criminal Division.

41.     Specifically, Shepard states that she will, "see what staff is doing…they probably doing nothing, probably on the Internet…shopping…doing crazy stuff".

42.     At the time Shepard recorded the video, Burrell was working in the DC Superior Court Calendar Coordinator's office.

43.     In the video, as she was recording, Shepard approached Burrell as she [Shepard] was walking through the office and instructed Burrell to say, "Hi Burrell".

44.     Burrell followed Shepard's instructions and said, "Hi Burrell", as Shepard was recording her.

45.     Immediately after Shepard focused the camera on Burrell, Shepard stated, "You so ignorant…whatever…whatever, I hate ignorant black folk, they get on my nerve", as she walked away from Burrell.

46.     Shepard continued recording for approximately thirty more seconds after her interaction with Burrell.

47.     After Shepard recorded the video, she published it on social media websites, including Facebook.

48.     Shepard posted the video on Facebook at approximately 12:52 pm.

49.     Eighty-nine (89) people viewed the video on Facebook and three (3) people "liked" it.

50.     At the time Shepard published the video on Facebook, she was "Facebook friends" with DC Superior Court employees, including but not limited to other individuals who work in the Criminal Division with Burrell.

51.     DC Superior Court Criminal Division managerial personnel were fully aware that the video was published on Facebook.

52.     The day after the video was posted, Burrell was not at work.

53.     One of Burrell's co-workers, Spring Hammer, took the video and reported it to the Clerk of the Court.

54.     The Clerk of the Court referred her to Yvonne Martinez-Vega ("Martinez-Vega"), Deputy Director of the Criminal Division, who took no action.

55.     Martinez-Vega, who is friends with Shepard on Facebook, said she did not see the video posted on Facebook.

56.     Despite being fully aware of the video published on Facebook, DC Superior Court Criminal Division managerial personnel chose not to initiate any action against Shepard for her violation of the Court's policies.

57.     On or about April 4, 2016, Burrell filed a bullying/harassment complaint with the DC Superior Court Human Resources Division against Shepard and other DC Superior Court Criminal division personnel.

58.     R. Tyrone Jackson ("Jackson"), the Deputy Director of Human Resources, met with Lockett, Martinez-Vega, and Burrell to explain the process for the complaint filed by Burrell.

59.     During the aforementioned meeting, Burrell requested to be transferred or reassigned to another division within the DC Superior Court.

60.     Burrell's transfer or reassignment would have removed her from the situation and protected her from having to interact with Shepard and others who were discriminating against her or who might retaliate against her for the complaint.

61.     Jackson denied Burrell's request to be transferred or reassigned to another division, and asserted that this would only be done to satisfy an operational need of the Court.

62.     Later that afternoon, Jackson sent a summary of the meeting to Burrell.

63.     Jackson informed Burrell that the results from the investigation would be sent to her, indicating whether her claim had been substantiated.

64.     Jackson further informed Burrell that the results would also be given to Cipullo, who would determine the appropriate action, if any, to be taken.

65.     Although Burrell mentioned prior instances of harassment and racial discrimination in her meeting with Jackson, he informed Burrell in his e-mail that there would be no investigation into these claims.

66.     On or about April 18, 2016, more than three weeks after the video was recorded and posted, Shepard sent an e-mail about the incident to all of the DC Superior Court Criminal Division employees, stating that her actions were only a joke.

67.     In the aforementioned e-mail, Shepard apologized for violating the Court's policies regarding unauthorized videos.

68.     In the aforementioned e-mail, Shepard apologized that some individuals took offense to the video recording.

69.     In the aforementioned e-mail, Shepard stated "Over the years, we have all joked with each other regarding what it is we are doing during work hours; the comments in the video were simply one of those moments".

70.     Shepard's statement that this incident was an example of the type of jokes that have been made over the years is an admission that this type of offensive conduct has been going on for some time, and the supervisors view this type of conduct as a joke.

71.     Shepard did not apologize for publishing the video on Facebook.

72.     Shepard did not state that the content of the video was wrong or discriminatory.

73.     Shepard did not apologize for the misconduct; she only apologized for the fact that some employees of the DC Superior Court took offense to the video.

74.     On or about April 20, 2016, Cipullo held a meeting with all of the DC Superior Court Criminal Division employees to discuss the incident.

75.     During the aforementioned meeting, Cipullo stated that Nancy McKinney ("McKinney") would replace Shepard.

76.     Cipullo further noted that Shepard would take McKinney's position.

77.     During this meeting, Cipullo asked if anyone had any questions regarding this change.

78.     In response to Cipullo, DeAndra Brown ("Brown"), who was a victim of alleged harassment by McKinney in the past, asked if Cipullo would consider any other choices for Branch Chief to replace Shepard.

79.     Cipullo replied to Brown's question stating there were no other choices for the replacement of Shepard in the position of Branch Chief.

80.     Prior to obtaining the promotion to Branch Chief, McKinney was allegedly investigated by Human Resources for her role in bullying and racial discrimination within the Criminal Division, which allegedly led to her demotion from Branch Chief of the Criminal Division to Program Analyst.

81.     Pam Boyd ("Boyd") followed Brown's question by asking Cipullo to explain why McKinney would again be placed in charge of the Criminal Division when she had previously been demoted for misconduct toward the Criminal Division employees after a Human Resources investigation.

82.     Cipullo answered Boyd's question by stating that McKinney had not been demoted, but that a position had been created for her, she applied for it, and she got it.

83.     Cipullo denied any investigation related to McKinney's misconduct as Branch Chief of the Criminal Division, calling it an "urban legend".

84.     Cipullo further stated that even if there had been an investigation related to McKinney's misconduct as Branch Chief of the Criminal Division, this was a confidential Human Resources matter.

85.     After the discussion about McKinney replacing Shepard concluded, some employees spoke up about the complaint filed against Shepard.

86.     The above-mentioned employees stated the video should not have been reported, and that anyone who was offended should have taken their concerns directly to Shepard rather than reporting the video.

87.     Cipullo voiced his agreement with the sentiment that the video incident should not have been reported, and that any concerns should have been taken directly to Shepard.

88.     Cipullo's agreement with the sentiment amounts to discouraging employees from reporting incidents that involve bullying, harassment, or racial discrimination.

89.     On or about April 20, 2016, Patricia Ruiz ("Ruiz"), the Arraignment Courtroom Clerk, sent an email to the employees of the DC Superior Court Criminal Division.

90.     Ruiz's email stated, "Where I'm from, when you're hurt by something someone does, you address that person first and if a resolution can't be reached, *then* further action is taken".

91.     Ruiz's email further stated, "I'm concerned about the heart and motive of any person who would attempt to stain someone's reputation over such a petty offense; especially someone who has recently suffered a devastating personal loss. To see that person cheerful for the first time in a while and take aim at it is disheartening. It appears opportunistic and motivated by other factors."

92.     Ruiz's email was further retaliation for Burrell's filing of a complaint against Shepard for bullying and racial harassment. Ruiz's email admonished individuals for reporting Shepard's video.

93.     Cipullo's affirmative endorsement of discouraging the reporting of incidents that involve bullying, harassment, and discrimination opened the door for other employees and supervisors to retaliate against Burrell and any other employee who files a complaint.

94.     No action was taken by Cipullo, or any managerial personnel, regarding the email sent by Ruiz.

95.     Subsequent to the meeting with Cipullo, many DC Superior Court employees published derogatory comments about Burrell on Facebook, and labeled her as a "#bitterbetty".

96.    On Wednesday, April 20, 2016, at 3:49 pm, Maika Hodge ("Hodge") posted a Facebook status saying, "People are soooo fake here…Smile in ur face a do malicious things to tear u down behind ur back #bitterwomen #ithoughtwewereadults".

97.    The aforementioned Facebook status was posted at 3:49 pm, during Cipullo's staff meeting, which Hodge did not attend.

98.    Tai Elizabeth later shared the aforementioned Facebook status with the comment, "I'm gonna sit this right here…Just in case a bitter Betty missed it".

99.    Ruiz also made a Facebook status, which included a photo, saying, "The look on your face when you swore Almighty God you was gonna get someone fired but your plan BACKFIRED and she just taking leave to rest up all to come back #andstill be YO BOSS #Godblockedit #oops #youtrieditthough #bitterbetty #tearforyoass #Aforeffort".

100.   Ruiz also posted a comment on Facebook saying, "I said mine in real life on Facebook I'll say it to faces it doesn't matter to me. When you do something that underhanded you need to get clowned".

101.   All of the aforementioned Facebook posts and comments clearly represent further retaliation for Burrell's filing of a complaint against Shepard for bullying and harassment.

102.   Upon information and belief, Cipullo and other managers with supervisory authority were aware of the aforementioned social media posts.

103.   Upon information and belief, some of the aforementioned social media posts were made during operational hours of the DC Superior Court by employees who were at work that day.

104.    The DC Superior Court Employee Code of Conduct in effect at the time of the aforementioned social media posts stated "Court employees shall not use social media in a manner that is malicious, abusive, harassing, scandalous, or libelous towards other employees or is otherwise detrimental to the DC Courts."

105.    Upon information and belief, no manager or supervisor at DC Superior Court took any corrective or disciplinary action against employees for the aforementioned social media posts.

106.    Upon information and belief, no manager or supervisor at DC Superior Court took any action to reassure employees that they were not discouraged to report incidents of harassment or racial discrimination, nor did they take any action to assure employees they would be protected from retaliation for reporting incidents of harassment or racial discrimination.

107.    On or about May 10, 2016, Gloria Trotman ("Trotman") of the District of Columbia Courts Human Resources Division informed Burrell via letter that the bullying complaint she lodged against Shepard was substantiated.

108.    Trotman's letter stated that in accordance with the Anti-Bullying Policy No. 420, the notice substantiating the bullying/harassment allegation would be forwarded to Cipullo who would determine the appropriate action, if any, to be taken.

109.    On or about May 11, 2016, Jackson informed Burrell via email that the relief she requested, transfer or reassignment, would not be directed or granted by Human Resources, and that it would only be sought by the Division Head, Cipullo, as appropriate and in alignment with the operational needs of the division and the Court.

110.   Upon information and belief, the only remedial action that has been taken by Cipullo in connection with the substantiated bullying finding against Shepard was her temporary reassignment to McKinney's position.

111.   In October 2016, Shepard returned to the position of Branch Chief of the Criminal Division and was in direct and close proximity to Burrell's desk.

112.   As Branch Chief of the Criminal Division, Shepard resumed her role as the immediate supervisor of Burrell.

113.   As Branch Chief of the Criminal Division, Shepard was once again directly involved with Burrell's performance evaluation and other decisions affecting the terms of Burrell's employment.

114.   A DC Superior Court performance evaluation is the instrument that determines if a court employee needs improvement or meets and/or exceeds expectations and influences whether an employee receives a performance bonus.

115.   Cipullo took measures to effectuate Shepard's reassignment without any apparent alignment with the operational needs of the division and the Courts.

116.   Cipullo has taken no action to honor Burrell's request to be transferred or reassigned.

117.   Subsequent to the incident involving Shepard, Burrell submitted a request to the Human Resources Division for leave due to work related stress.

118.   In approximately May or June of 2016, the Human Resources division denied Burrell's request for leave due to work related stress.

119.   There has been continual evidence of an ongoing hostile work environment at the DC Superior Court Criminal Division for an extended period of time.

120.    Cipullo has been fully aware of the extent and severity of discrimination toward females and African-Americans, the hostile work environment, and the overall negative culture in the Criminal Division for an extended period of time.

121.    Cipullo himself has perpetuated the hostility of the work environment through his own actions and through his endorsement of others' hostile and discriminatory actions.

122.    During Cipullo's tenure as the Director of the DC Superior Court Criminal Division, numerous DC Superior Court Criminal Division employees filed internal grievances and EEOC Charges of Discrimination against Cipullo, which alleged racial discrimination and a hostile work environment.

123.    Upon information and belief, DC Superior Court has taken no corrective or disciplinary action against Cipullo, despite the numerous complaints alleging racial discrimination and harassment.

124.    During Cipullo's tenure as the Director of the DC Superior Court Criminal Division, he retaliated against African-American DC Superior Court Criminal Division employees for filing internal grievances and EEOC Charges of Discrimination.

125.    Other supervisors and managers at the DC Superior Court have retaliated against African-American DC Superior Court Criminal Division employees for filing internal grievances and EEOC Charges of Discrimination against Cipullo.

126.    The aforementioned retaliation by Cipullo and other supervisors and managers against other female African-American Criminal Division employees has included, upon information and belief, denials of promotions, denials of leave requests, disciplinary actions, denials of compressed days off, and low performance reviews.

127.    During Cipullo's tenure as the Director of the DC Superior Court Criminal Division, he subjected numerous DC Superior Court Criminal Division African-American employees to intolerable working conditions.

128.    Bridgette Dunn ("Dunn"), a member of the Case Management Team, has witnessed and reported bullying and harassment at the DC Superior Court to Martinez-Vega.

129.    In an email exchange on July 9, 2015, between Martinez-Vega and Dunn, Dunn mentioned the negative culture and atmosphere that employees must endure in the DC Superior Court Criminal Division.

130.    In the aforementioned email exchange, Dunn alerted Martinez-Vega to a work culture that includes disparaging comments by supervisors to their subordinates and supervisors admonishing employees for behaviors such as requesting clarification on issues or situations.

131.    Dunn explained that after an employee asks a supervisor for clarification or initiates a similar request, it is common for the supervisor to speak negatively about that employee in front of other employees who are socializing with the supervisors in their offices during the Court's business hours.

132.    Dunn stated that the above-noted conduct has been so prevalent for a substantial period of time that employees just accept it as the status quo, either because they are numb to it or feel too intimidated to file complaints.

133.    The aforementioned harassment, bullying, and discrimination regarding female and African-American employees has been going on for quite some time, and the DC Superior Court management has been on actual notice of numerous incidents.

134.    In July 2016, Burrell was involved in a car accident unrelated to work.

135.    Burrell properly requested medical leave due to the aforementioned car accident from Martinez-Vega and Cipullo.

136.    Burrell was only granted intermittent leave, and was required to work before and after any medical treatments she received.

137.    This intermittent leave detrimentally impacted her recovery, as she requested full medical leave in order to have consistent and consecutive days to fully recover from her injuries, per her doctor's directive.

138.    It was not until September 2016 that Burrell was approved for twelve (12) weeks of FMLA leave for the specific injuries she suffered in the aforementioned car accident.

139.    While on FMLA leave Burrell learned of Shepard's return to her previous position in October 2016.

140.    On or about November 22, 2016, Burrell submitted her resignation letter.

141.    In the aforementioned resignation letter, Burrell stated that due to the fact that DC Superior Court does not take bullying and hostile work environment seriously, she felt resigning was the best option at that time.

142.    The management at the DC Superior Court has inadequately responded to, or chosen to ignore, almost all incidents involving harassment, bullying, and discrimination toward female and African-American employees.

143.    The harassment, bullying, and discrimination became so severe and pervasive that it constituted a hostile work environment.

144.    Burrell and other DC Superior Court Criminal Division employees were forced to labor in the hostile work environment for quite some time.

145.    In addition to being on notice of the hostile work environment and choosing to remain deliberately indifferent to it by failing to take any meaningful action, the Criminal Division denied Burrell's request for reassignment or transfer.

146.    Management at the DC Superior Court, including but not limited to Cipullo, have both discouraged reporting of harassment, bullying, and discrimination and endorsed retaliation against employees who file a report of harassment, bullying, or discrimination.

<u>**COUNT I**</u>
**Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. §2000(e) and the District of Columbia Human Rights Act (DCHRA), DC Code §2-1402.01**
**(Against Defendant District of Columbia)**

147.    Plaintiff incorporates by reference paragraphs 1 through 146 as if fully set forth herein.

148.    Burrell, as an African-American female is a member of a protected class.

149.    The harassment, bullying and discrimination of Burrell from 2005 until Burrell's employment ended in November 2016, perpetrated by defendants Cipullo, Shepard, CSO Claire, and other unnamed DC Superior Court employees was motivated by Burrell's sex and race. This harassment, bullying and discrimination was intentional, severe, and pervasive.

150.    During the period that Burrell has been employed at the DC Superior Court, the workplace has been permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive enough to alter the conditions of her employment, and has created an abusive working environment.

151.    The following are examples, but not an exhaustive list, of acts and omissions that created a hostile work environment for Burrell on the basis of her race and sex:

a. The video created by Alicia Shepard and posted on Facebook

b. Subsequent emails from employees admonishing the reporting of the video incident

c. Subsequent statements made by employees during a meeting discouraging reporting incidents like the video

d. Cipullo's vocal agreement with employees' statements that discouraged reporting incidents like the video

e. Subsequent social media posts by employees discouraging the reporting of incidents like the video and harassing Burrell for speaking out about the video

f. The temporary swapping of positions between McKinney, who had a known history of racial harassment and discrimination against Criminal Division employees, and Shepard.

g. Shepard returning to her position as Burrell's Branch Chief

h. The denial of Burrell's reassignment and transfer requests

i. The denial of Burrell's FMLA requests for stress leave

j. Forcing Burrell to only take intermittent FMLA leave when she was injured in a car accident

k. The sexual harassment by CSO Claire and DC Superior Court's subsequent failure to take any action

152. Supervisors with the power to remedy the continual racial harassment of African-American female employees were on actual and constructive notice of this

discrimination, but chose to take no meaningful action, remaining deliberately indifferent to the situation.

153.    The fact that a pattern of racial harassment, discrimination and bullying toward Burrell and other African-American female employees was considered by supervisors of Burrell to be a joke, as evidenced by Shepard's email, provides evidence of a hostile work environment.

154.    Supervisors, including but not limited to Cipullo, expressly discouraged Burrell and others from filing complaints relating to racial harassment, discrimination, and bullying.

155.    On the rare occasions when management has taken action in response to reports of racial harassment, bullying, and discrimination in the Criminal Division, their actions have done nothing to remedy the overall hostile work environment, and have been mere token gestures.

156.    The decision to temporarily re-assign Shepard to another position and have her replaced by McKinney, who was allegedly previously charged with discrimination in the Criminal Division, constitutes one of many examples of ineffective actions taken by management.

157.    The DC Superior Court has continually denied Burrell's reasonable requests for relief from the hostile work environment, including but not limited to her requests for transfer and reassignment.

158.    The DC Superior Court Human Resources Department has refused to investigate prior instances of racial harassment, discrimination, and bullying when Burrell raised them in her internal complaint.

159.     The totality of circumstances demonstrates that Burrell and other female African-American DC Superior Court Criminal Division employees were subjected to a hostile work environment because of their race.

160.     The hostile work environment created has harmed Burrell by causing her significant mental anguish, extreme emotional distress, and other compensable injuries.

161.     Burrell requested stress leave as a result of the hostile work environment, which was denied.

162.     The hostile work environment became too much for Burrell, and she could not bear to return to work under the supervision of Alicia Shepard again, causing Burrell to resign.

163.     Burrell's resignation constitutes a constructive termination due to the severe and pervasive hostile work environment.

### COUNT II
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. §2000(e) and the District of Columbia Human Rights Act (DCHRA), DC Code §2-1402.01**
**(Against Defendant District of Columbia)**

164.     Plaintiff incorporates by reference paragraphs 1 through 163 as if fully set forth herein.

165.     Burrell engaged in a protected activity when she filed her internal complaint with DC Superior Court Human Resources Division.

166.     Defendant District of Columbia had actual knowledge of the protected activity, as Burrell filed a formal complaint.

167.     Burrell suffered adverse employment actions, including but not limited to:

a. The subsequent denial of Burrell's requests for transfer and reassignment

b. The subsequent denial of Burrell's stress leave

c. The subsequent decision to make Burrell take her medical leave after her car accident intermittently

d. The subsequent statements by other employees discoursing reporting incidences of racial harassment such as the Shepard video.

e. Cipullo's actions openly discouraging reporting of incidences of racial harassment such as the Shepard video.

168. The open discouragement by Cipullo and other employees for reporting incidences of racial harassment such as the Shepard video serve to dissuade a reasonable worker from making or supporting a charge of discrimination.

169. There was a causal connection between each of the adverse employment actions Burrell suffered and her engaging in the protected activity of filing a formal complaint.

170. Any non-discriminatory reason proffered by Defendant District of Columbia for the adverse actions Burrell suffered are pretextual.

171. As a result of the retaliation, Burrell was forced to resign and was constructively terminated.

172. Defendant District of Columbia is liable for the violation of Burrell's rights under Title VII and the DCHRA.

## COUNT III
**Violation of Plaintiff's Rights Pursuant to the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983 Race Discrimination**
**(Against Cipullo and Shepard)**

173. The plaintiff incorporates by reference paragraphs 1 through 172 as if fully set forth herein.

174. Burrell is a member of a protected class as an African-American female.

175. At all times relevant herein, Burrell possessed federally protected rights pursuant to the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983, to be secure from states' actions that would deprive them of life, liberty, or property without due process of law.

176. At all times relevant herein, Cipullo and Shepard were state actors under the color of law, custom, or usage of defendant District of Columbia.

177. Burrell possessed federally protected rights under the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983 to be free from racial and gender discrimination.

178. The intentional acts and omissions of Cipullo and Shepard, described herein motivated by Burrell's race and sex.

179. The acts and omissions of Cipullo and Shepard described herein deprived Burrell of her federally protected rights afforded to her pursuant to the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983.

180. Burrell has been damaged by Cipullo and Shepard's violations of her federally protected rights pursuant to the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983.

181. Cipullo and Shepard are liable for the violations of Burrell's federally protected rights pursuant to the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983.

182. In taking the discriminatory actions described herein, Cipullo and Shepard, have acted with malice and reckless indifference to Burrell's rights pursuant to the Equal Protection Clause under the Fifth Amendment, giving rise to punitive damages.

**COUNT V**
**42 U.S.C. §1983 Monell Claim for Violations of Plaintiff's Fifth Amendment Constitutional Rights**
**(Against the District of Columbia)**

183. Plaintiff incorporates by reference paragraphs 1 through 182 as if fully set forth herein.

184. At all relevant times herein, Burrell had a Fifth Amendment right to Equal Protection to be free from racial and sexual harassment.

185. Defendants Cipullo, Shepard, Martinez-Vega, and CSO Claire and other managers, supervisors and employees have violated Burrell's Fifth Amendment right to Equal Protection.

186. At all relevant and material times herein, the DC Superior Court employees mentioned herein acted under the color of law and were on duty and performing their jobs as DC Superior Court employees, executive officials and managerial personnel and/or supervisors pursuant to the authority vested to them by defendant District of Columbia.

187. At all relevant times herein Cipullo, Martinez-Vega, Shepard and other managers and supervisors acted with final policymaking authority of the District of Columbia.

188. At all relevant times herein, the District of Columbia had a custom, policy and practice of deliberate indifference towards the discrimination against African-Americans at the DC Superior Court by executive officials, managerial personnel, supervisors and employees at DC Superior Court.

189.    At all relevant times herein, the District of Columbia had a custom, policy and practice of ignoring discrimination against African-Americans at the DC Superior Court by executive officials, managerial personnel, supervisors and employees of DC Superior Court.

190.    At all relevant times herein, the District of Columbia had a custom, policy and practice of discriminating against African-Americans at the DC Superior Court, specifically in the Criminal Division, by harassing and bullying them due to their race.

191.    At all relevant times herein, the District of Columbia had a custom, policy and practice of not equally enforcing the internal rules and code of conduct of DC Superior Court when the violation harmed African-American employees.

192.    At all relevant times herein, the District of Columbia had a custom, policy and practice of to discourage African-American employees at DC Superior Court from reporting instances of racial harassment, bullying and discrimination.

193.    At all relevant times herein, the District of Columbia had a custom, policy and practice of retaliating against African-American employees at DC Superior Court who reported instances of racial harassment, bullying and discrimination.

194.    The District of Columbia had actual knowledge of racial discrimination against African-American employees at DC Superior Court, but took no meaningful action to address this discrimination or prevent future discrimination.

195.    The District of Columbia did not provide adequate training to the Human Resources employees at DC Superior Court in handling complaints of racial harassment, discrimination and bullying. Specifically, there is insufficient training in investigating

complaints of racial harassment and discrimination. In addition, there is insufficient training in protective and remedial measures for complainants.

196.     The District of Columbia did not provide adequate training to managers and supervisors at DC Superior Court in how to address complaints of racial harassment, discrimination and bullying. Specifically, there is insufficient training in necessary remedial measures, corrective measures and disciplinary measures.

197.     The District of Columbia did not provide adequate training to employees at DC Superior Court in how to prevent instances of racial harassment, discrimination and bullying.

198.     The District of Columbia did not provide adequate training to employees at DC Superior Court as to what constitutes racial harassment, discrimination and bullying.

199.     The above-described policies, customs and practice demonstrate a deliberate indifference on the part of policymakers of the District of Columbia to the constitutional rights of women and African-American DC Superior Court employees. These policies, customs and practices were the direct and proximate cause of the violation of Burrell's rights as described and alleged herein.

200.     As a result of the deficient training and lack of training by the District of Columbia, the DC Superior Court employees referenced herein were incapable of doing their job without violating the constitutional rights of women and African-American DC Superior Court employees with whom they came into contact.

201.     As a result of the deficient training and lack of training by the District of Columbia, the DC Superior Court employees referenced herein were incapable of

addressing and preventing the violation of the constitutional rights of women and African-American DC Superior Court employees.

202.     Defendant District of Columbia had actual and constructive knowledge of the deficiencies in training and the discriminatory nature of the customs, practices and policies referenced herein, but remained deliberately indifferent to them and the foreseeable constitutional violations that arose from them.

203.     As a direct and proximate result of the official and unofficial policies, procedures, customs, usages, and practices of the District of Columbia, it is directly liable pursuant to 42 U.S.C. §1983 for the violations of Burrell's constitutional rights as described in the claims asserted and alleged herein.

204.     As a direct and proximate result of the policies and customs described above, Burrell has been damaged emotionally, mentally and economically.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Burrell demands judgment against all defendants as follows:

I.   Re-pleads and re-alleges paragraphs 1 through 204 with the same force and effect as if fully set forth herein;

II.   Subject to further discovery, reserve the right to amend the complaint;

III. An award of compensatory damages in favor of Burrell for the Title VII violations;

IV. An award of compensatory damages in favor of Burrell for the 42 U.S.C. § 1983 violations;

V.   An award of punitive damages in favor of Burrell for the 42 U.S.C. § 1983 violations by Shepard and Cipullo.

VI. An award of compensatory damages in favor of Burrell for the District of

Columbia Human Rights Act violations;

VII.       Attorney's Fees, costs and prejudgment interest;

VIII.      And any other relief this Court deems just and fair;

Stefanie Burrell
By Counsel


Respectfully submitted,


*/s/ Billy L. Ponds*
Billy L. Ponds
Counsel for the Plaintiff
The Ponds Law Firm
2101 L Street, NW
Suite 400
Washington, DC 22037
Telephone Number: (202) 333-2922
E-Mail: PLFPC@aol.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | | |
|---|---|---|
| **STEFANIE BURRELL** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No.: _____** |
| | : | |
| **v.** | : | **JURY DEMAND** |
| | : | |
| **ALICIA SHEPARD,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

==============================

### JURY DEMAND

The plaintiff hereby requests a trial by jury of twelve (12) on all triable issues, including the amount of damages to be awarded.

Stefanie Burrell
By Counsel

Respectfully submitted,

*/s/ Billy L. Ponds*
Billy L. Ponds
Counsel for the Plaintiffs
The Ponds Law Firm
Bar Number 379883
2101 L Street, N.W.
Suite 400
Washington, D.C. 20037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com
