**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                                    )
STEFANIE BURRELL,                   )
                                    )
              Plaintiff,            )
                                    )
         v.                         )  Civil Action No. 17-1837 (EGS)
                                    )
ALICA SHEPARD, DANIEL CIPULLO,      )
and the DISTRICT OF COLUMBIA,       )
                                    )
              Defendants.           )
                                    )
```

## MEMORANDUM OPINION

Plaintiff Stefanie Burrell claims that, after she lodged a harassment complaint against her supervisor in the Superior Court of the District of Columbia, her colleagues created a hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et. seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code Ann. § 2-1402.21. She further claims that her constitutional right to equal protection under the law was violated pursuant to 42 U.S.C. § 1983 ("section 1983"). To vindicate these rights, Ms. Burrell filed the instant suit against two supervisors – Alicia Shepard and Daniel Cipullo — and the District of Columbia. Pending before the Court is defendants' motion to dismiss the amended complaint. Upon consideration of the amended complaint, defendants' motion, the

response and reply thereto, and the applicable law, the Court **GRANTS IN PART AND DENIES IN PART** defendants' motion to dismiss.

## I. Background

Ms. Burrell is an African-American woman who served as a calendar coordinator in the Criminal Division of the Superior Court of the District of Columbia ("Superior Court"). Am. Compl., ECF No. 10 ¶ 7. Ms. Burrell worked at the Superior Court from May 2, 1992 until she submitted her resignation letter on November 22, 2016. *Id.* ¶¶ 14, 133. She alleges that, during her tenure at the court, she "suffered from an ongoing pattern of discrimination toward African-American employees." *Id.* ¶ 16.

The first incident Ms. Burrell points to in support of her allegations occurred on July 25, 2005. *Id.* ¶ 18. On that date, a court security officer allegedly "made a sexual derogatory remark" that made Ms. Burrell "feel extremely uncomfortable." *Id.* ¶ 18. Ms. Burrell reported the incident to the officer's supervisor and others, but "no action" regarding her complaint was taken. *Id.* ¶¶ 21-25.

The second incident Ms. Burrell points to occurred more than ten years later, on March 23, 2016. *Id.* ¶ 29. On that date, Ms. Burrell alleges that Ms. Shepard — who was the Branch Chief of the Criminal Division and one of Ms. Burrell's supervisors — recorded a video on her cell phone in which she made "disparaging comments about the work ethic of her subordinates."

*Id.* ¶¶ 10, 29-38. In the course of filming this video, Ms. Burrell alleges that Ms. Shepard "focused the camera" on Ms. Burrell and made the following statement: "You so ignorant . . . whatever . . . whatever, I hate ignorant black folk, they get on my nerve." *Id.* ¶ 37. Ms. Shepard then posted the video on multiple social media platforms where other Superior Court employees could see it. *Id.* ¶¶ 39-41. Upon seeing the video, one of Ms. Burrell's coworkers "took the video and reported it to the Clerk of the Court." *Id.* ¶ 43. Although the Clerk and other supervisors in the Criminal Division were "fully aware of the video," Ms. Burrell asserts that "managerial personnel chose not to initiate any action against Shepard." *Id.* ¶ 46.

On April 4, 2016, Ms. Burrell filed a "bullying/harassment complaint" against Ms. Shepard and other Superior Court Criminal Division personnel with the Human Resources Division. *Id.* ¶ 47. Ms. Burrell also requested to be transferred or reassigned to another division. *Id.* ¶ 50. That request was denied because, according to the Deputy Director of Human Resources, transfers were only "done to satisfy an operational need of the Court." *Id.* ¶ 51. The Deputy Director also informed Ms. Burrell that her complaint would be investigated and that the results would be sent to her and Daniel Cipullo, the Director of the Criminal Division, who "would determine the appropriate action, if any, to be taken." *Id.* ¶¶ 11, 54. Ms. Burrell alleges that Mr.

Cipullo has "been aware of, and perpetuated, discriminatory acts that create a hostile work environment" during his tenure at the Superior Court. *Id.* ¶ 103. For example, Mr. Cipullo allegedly "hired and promoted Caucasian individuals who are less qualified than similarly-situated African Americans"; "intentionally intimidated African-American female employees" by, for example, "aggressively" yelling at them; "ordered African-American employees to attend and perform menial tasks at judicial conferences, while similarly situated Caucasian employees have either been exempt or given professional roles"; and "assigned African-American female employees offices that are under construction, while giving similarly situated non-African-American employees offices that were not under construction." *Id.* ¶¶ 105-109. According to Ms. Burrell, "numerous Superior Court Criminal Division employees filed internal grievances and EEOC Charges of Discrimination" against Mr. Cipullo based on claims of racial discrimination. *Id.* ¶ 104.

Ms. Burrell alleges that, after she filed her complaint against Ms. Shepard, her coworkers and Ms. Shepard "refused to speak with her," making it difficult for her to perform her work duties and denying her access to a Branch Chief. *Id.* ¶¶ 56-57. Ms. Burrell claims that access to a Branch Chief is critical because it "allows employees the benefit of recognition, allows

their ideas and suggestions to be heard, and strengthens their professional network within the workplace." *Id.* ¶ 58.

On April 18, 2016, Ms. Shepard sent an e-mail about the video incident to all of the employees in the Criminal Division. *Id.* ¶ 61. In the e-mail, Ms. Shepard wrote: "Over the years, we have all joked with each other regarding what it is we are doing during work hours; the comments in the video were simply one of those moments." *Id.* 62. A few days later, Mr. Cipullo held a meeting with the Criminal Division employees to discuss the incident. *Id.* In the course of the meeting, several employees "stated that the video should not have been reported" and that any individual who was offended should have taken his or her concerns directly to Ms. Shepard. *Id.* ¶¶ 72-73. Mr. Cipullo purportedly "voiced his agreement with th[at] sentiment." *Id.* ¶ 74. Later that same day, another Superior Court employee sent an email to the employees of the Criminal Division in which she admonished the individuals responsible for reporting the video. *Id.* ¶¶ 76-79. In addition, other employees "published derogatory comments about Burrell on Facebook" regarding her decision to file a complaint against Ms. Shepard. *Id.* ¶¶ 82-83. Ms. Burrell states that she was "intimidated by the constant statements from her coworkers and the sentiments expressed by Cipullo that she was wrong for filing a complaint alleging racial harassment and discrimination against her supervisor." *Id.* ¶ 99. Ms. Burrell

alleges that her experience made her "fearful of speaking out about any further incidents." *Id.* ¶ 100.

On May 10, 2016, Ms. Burrell was informed that her complaint against Ms. Shepard had been substantiated, and that a notice would be sent to Mr. Cipullo, who would then determine whether any action was warranted. *Id.* ¶¶ 88-89. Ms. Burrell claims that the only action taken by Mr. Cipullo was to assign Ms. Shepard to a program analyst position for a period of approximately five months. *Id.* ¶¶ 65, 91-92. In October 2016, Ms. Shepard returned to her position as Branch Chief of the Criminal Division and resumed her role as Ms. Burrell's immediate supervisor. *Id.* ¶¶ 92-93.

In May or June 2016, Ms. Burrell requested "leave due to work related stress that was . . . caused by . . . the Shepard video and the backlash against Burrell for filing a complaint." *Id.* ¶ 98. The Human Resources Director denied her request. *Id.* ¶ 102. In July 2016, Ms. Burrell was involved in a car accident and requested medical leave from Mr. Cipullo. *Id.* ¶¶ 121-122. She claims that, initially, she was only given "intermittent leave," which "detrimentally impacted her recovery." *Id.* ¶¶ 123-124. It was not until September 2016 that she was approved for twelve weeks of medical leave under the Family Medical Leave Act. *Id.* ¶ 125. While on medical leave, Ms. Burrell learned that Ms. Shepard would be returning to her position as Branch Chief

of the Criminal Division in October 2016. *Id.* ¶ 132. On November 22, 2016, Ms. Burrell submitted her resignation letter. *Id.* ¶ 133. She claims that she was "forced to resign due to the ongoing hostile work environment." *Id.* ¶ 134.

Based on these facts, Ms. Burrell asserts the following claims: (1)a race discrimination claim based on a hostile work environment under Title VII and the DCHRA against the District of Columbia (Count I), *see* ¶¶ 141-157; (2) a race discrimination claim based on a hostile work environment under the DCHRA against Ms. Shepard and Mr. Cipullo (Count II), *see* ¶¶ 158-167; (3) a retaliation claim under Title VII and the DCHRA against the District of Columbia (Count III), *see* ¶¶ 168-176; (4) a retaliation claim under the DCHRA against Mr. Cipullo (Count IV), *see* ¶¶ 177-186; and (5) equal protection claims pursuant to section 1983 against the District of Columbia, Mr. Cipullo, and Ms. Shepard (Counts V and VI), *see* ¶¶ 187-212. Defendants move to dismiss the amended complaint, arguing that Ms. Burrell's claims are "either untimely or facially implausible." *See* Defs.' Mem. in Supp. of Mot. to Dismiss. Am. Compl. ("Defs.' Mem."), ECF No. 12-1 at 6.

## II. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A

complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell At. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While detailed factual allegations are not required, a complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When ruling on a Rule 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621,624 (D.C. Cir. 1997). In so doing, the court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## III. Analysis

Ms. Burrell alleges both discrimination and retaliation claims based on hostile work environment under Title VII and the DCHRA. Because the legal standards for establishing these claims under Title VII and the DCHRA are substantively the same, the Court will analyze Ms. Burrell's claims under these statutes together. *See e.g.*, *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (explaining that, "[i]n

interpreting its Human Rights Act the District of Columbia . . . generally seems ready to accept the federal constructions of Title VII, given the substantial similarity between it and the D.C. Human Rights Act").

## A. Exhaustion of Administrative Remedies for Title VII and DCHRA Claims

Defendants argue that Ms. Burrell's Title VII and DCHRA race discrimination and retaliation claims must be dismissed because Ms. Burrell failed to exhaust her administrative remedies in a timely manner. *See* Defs.' Mem., ECF No. 12-1 at 11, 20. Specifically, defendants maintain that, at the earliest, Ms. Burrell signed a charge of discrimination on March 6, 2017, and therefore only conduct that took place 300 days before that date — i.e, after May 11, 2016 — can form the basis of plaintiff's claims. *Id.* at 11-13.[1] According to defendants, only the conduct alleged after May 11, 2016 is actionable under Title VII or the DCHRA. This conduct includes: a denial of Ms.

_____

[1] In support of their arguments, defendants point to (1) an unsigned EEOC Charge of Discrimination dated March 6, 2017; (2) a signed Amended EEOC Charge of Discrimination dated May 23, 2017; and (3) a Notice of Charge of Discrimination sent to the Superior Court dated June 16, 2017. See Defs.' Mem. Exs. 1-3, ECF Nos. 12-3, 12-4, 12-5. Although defendants urge the Court to consider only the signed charge from May 23, 2017 in its timeliness analysis, defendants concede that "[i]t is possible that Plaintiff signed some earlier original charge that the EEOC forwarded to her on March 6, 2017." Defs.' Mem., ECF No. 12-1 at 13. Accordingly, for purposes of this motion to dismiss, the Court will assume that the initial EEOC charge was signed on March 6, 2017.

Burrell's request to transfer to a different division, a delay in granting Ms. Burrell's request for medical leave, the fact that Ms. Shepard was reassigned as Ms. Burrell's supervisor, and Ms. Burrell's decision to resign. *Id.* at 13-14.

Before commencing an action based on Title VII, a plaintiff must first exhaust her administrative remedies by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 210 (2010). Generally, "a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period — 180 or 300 days — set forth in 42 U.S.C. § 2000e-5(e)(1)." *Nat'l. Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). The lawsuit following the EEOC charge is "limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). Specifically, a plaintiff's claims "must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.*

Because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute 'one unlawful employment practice,'" the timeliness analysis for those claims is different than claims involving discrete acts.

*Morgan*, 536 U.S. at 117. For a hostile work environment claim to be timely, "the employee need only file a charge within . . . 300 days **of any act that is part** of the hostile work environment." *Singletary v. Dist. of Columbia*, 351 F.3d 519, 527 (D.C. Cir. 2003) (emphasis in the original); *see also Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."). Likewise, because this Circuit describes retaliatory hostile work environment claims "in terms of the discrimination standard," a retaliation claim based on allegations of a hostile work environment is timely "as long as just one of the alleged acts compromising the hostile work environment" fall within the statutory time period and the acts are part of the same unlawful employment practice." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 82 (D.D.C. 2013).

Here, defendants' arguments are premised on the assumption that Mr. Burrell's claims are based on a number of separate, discrete acts of discrimination. *See* Defs.' Mem., ECF No. 12-1 at 13-14. A fair reading of Ms. Burrell's amended complaint, however, makes clear that she is alleging that she was subjected to repeated acts of discriminatory intimidation and insult purportedly as a result of filing a complaint about her

11

supervisor. *See, e.g.*, Am. Compl., ECF No. 10 ¶ 143 ("During the period that Burrell has been employed at the Superior Court, the workplace has been permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive enough to alter the conditions of her employment, and has created an abusive working environment."); *id.* ¶ 147 (providing examples of conduct "that created a hostile work environment"); *id.*¶ 159 (relying primarily on the allegations set forth in Count I for Count II). Moreover, Ms. Burrell clarified in her opposition brief that she "brings her race discrimination claims under a theory of a hostile work environment." Pl.'s Opp'n, ECF No. 13-1 at 11. She further states that she has pled her retaliation claims "based upon both discrete adverse actions and a hostile work environment." *Id.*

Thus, assuming *arguendo* that defendants are correct that Ms. Burrell's claims are timely only if the allegedly discriminatory conduct took place after May 11, 2016, the Court finds that Ms. Burrell has plainly alleged acts that took place after that date as part of her discrimination and retaliation claims based on a hostile work environment. Those acts include, for example, defendants' refusal to transfer or reassign Ms. Burrell to a different division so that she would not have to "interact with Shepard and others who were discriminating against her or might retaliate against her" for lodging the

12

complaint. Am. Compl., ECF No. 10 ¶¶ 50, 90. They also include
Ms. Burrell's allegations that, after she made her complaint
about Ms. Shepard, Ms. Shepard would "admonish, mock and
belittle her" anytime she asked for any "assistance or
clarification" regarding her work duties. *Id.* ¶¶ 92-95, 115. Ms.
Burrell also alleges that the Superior Court denied her request
for leave due to work-related stress and delayed in granting her
request for medical leave after she was injured in a car
accident. *Id.* ¶¶ 98-102, 121-125. Taking these allegations
together and construing the amended complaint in a light
favorable to Ms. Burrell, the Court finds that Ms. Burrell has
plausibly alleged that she was subjected to a hostile work
environment, which may also have been a form of retaliation for
her decision to file a harassment complaint. Because Ms. Burrell
is able to "adequately link" the alleged retaliatory attacks
that occurred after May 11, 2016 to other acts occurring before
May 11, 2016, those acts are not time barred. *See Baird v.
Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011).

Defendants also argue that Ms. Burrell's DCHRA claims are
untimely for the same reasons. Defs.' Mem. , ECF No. 12-1 at 13.
As defendants acknowledge, the statute of limitations for
plaintiff's DCHRA claims was tolled by the filing of her EEOC
charge. *See* Defs.' Mem., ECF No. 12-1 at 13 (citing D.C. Code §
2-1403.16(a)). Here, assuming Ms. Burrell first filed her EEOC

charge on March 6, 2017, she may pursue any DCHRA claims that accrued on or after March 6, 2016. As explained above, Ms. Burrell has sufficiently alleged facts in support of a hostile work environment claim and retaliation claim within that time.

For all these reasons, the Court declines to dismiss Ms. Burrell's hostile work environment and retaliation claims on timeliness grounds at this juncture.

**B. Hostile Work Environment Claim**

Defendants next argue that, even if Ms. Burrell's allegations are timely, "they fail because Plaintiff has not sufficiently alleged that she was subject to a hostile work environment, or any other adverse action, because of her race or her sex." Defs.' Mem., ECF No. 12-1 at 14.

For starters, defendants' argument that Counts I and II should be dismissed because Ms. Burrell has not alleged an "adverse personnel action" fail. The requirement that a plaintiff must allege "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *see* Defs.' Mem., ECF No. 12-1 at 14 (quoting *Ndzerre v. Wash. Metrop. Area Transit. Auth.*, No. 15-1229, 2017 WL 3579890, at *4 (D.D.C. August 16, 2017)), only applies to claims of discrimination, not hostile work environment claims.

14

To state a claim under Title VII or the DCHRA based on a hostile work environment, a plaintiff must allege facts establishing that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). In evaluating a hostile work environment claim, the "court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). This standard is a demanding one, as Title VII is not intended to function as a "general civility code" that regulates the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Nonetheless, depending on the circumstances, a single incident may be sufficient to establish a hostile work environment. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (employer's alleged use of "a deeply offensive racial epithet when yelling at [the plaintiff] to get out of his office" may have been enough to state a claim based on a hostile

work environment). Moreover, conduct that is "severe **or** pervasive" is sufficient to state a hostile work environment claim. *Faragher*, 524 U.S. at 786 (emphasis added, internal quotation marks omitted).

In support of her hostile work environment claim, Ms. Burrell points to the video in which Ms. Shepard allegedly stated that she "hate[s] ignorant black folk." Am. Compl., ECF No. 10 ¶¶ 37, 147(b). She also points to the following examples of "acts and omissions that created a hostile work environment": (1) Ms. Shepard's mistreatment of her when she sought clarification or assistance in performing her work duties; (2) Mr. Cipullo permitting other employees to admonish her for reporting the video incident; (3) Mr. Cipullo permitting other employees to discourage individuals from reporting incidents like the video; (4) Mr. Cipullo's "vocal agreement" with the statements of other employees discouraging reporting incidents like that of the video; (5) isolating her for speaking out about the video; (6) social media posts by other employees harassing her for speaking out about the video; (7) Mr. Cipullo's decision to replace Ms. Shepard with another supervisor who also had a known history of racial harassment and discrimination; (8) allowing Ms. Shepard to return to her position as Branch Chief; (9) Human Resources' and Mr. Cipullo's denial of her transfer requests; (10) Human Resources denying her request for leave due

to work-related stress; (11) Mr. Cipullo's decision affording her only intermittent leave when she was injured in a car accident; (12) an alleged instance of sexual harassment in 2005; and (13) Mr. Cipullo's and Human Resources' refusal to investigate other instances of racial harassment, bullying, and discrimination. *Id.* ¶¶ 147(a)-(n).

Construing these allegations in the light most favorable to Ms. Burrell, the Court concludes that her hostile work environment claims survive defendants' motion to dismiss. Although defendants make a number of arguments as to why particular incidents or allegations are insufficient to create a hostile work environment, the Court "is obliged to consider the whole picture, not just particular pixels, in assessing whether a host of incidents amount to a pervasive pattern of hostility and ridicule." *Gilliard v. Gruenberg*, 302 F. Supp. 3d 257, 281 (D.D.C. 2018) (citation and internal quotation marks omitted). Although Ms. Burrell does not point to any conduct that is particularly severe, the Court is persuaded that she has alleged sufficient facts to plausibly support her claim that the purportedly discriminatory conduct was sufficiently pervasive. *See, e.g.*, *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 193 (D.D.C. 2008) (plaintiff's allegations that supervisor's "hostility [toward her] manifested itself through isolation, subjection to public ridicule and harmful treatment" were

sufficient to survive a motion to dismiss); *Ali v. Dist. of Columbia*, 697 F. Supp. 2d 88, 92 (D.D.C. 2010) (denying motion to dismiss the plaintiff's hostile work environment claim even though "it [was] unlikely that [the plaintiff's] claims of discrimination will ultimately prove meritorious").

Defendants also argue that, "even if the alleged conduct of Plaintiff's coworkers were sufficiently severe to constitute harassment . . . defendants would not be liable unless Plaintiff could show that they were negligent in controlling working conditions." Defs.' Reply, ECF No. 14 at 4; *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) ("To establish liability when a plaintiff is harassed by **his or her co-workers**, the plaintiff must prove that the employer was at least negligent in not preventing or correcting the harassment.")(emphasis in original). Here, however, plaintiff's claim rests, at least in part, on allegations that she was harassed by her **supervisors.** In such circumstances, "the employer is vicariously liable for a supervisor's actions, except when no tangible adverse employment action has been taken and the employer proves an affirmative defense." *Ayissi-Etoh*, 712 F.3d at 577-78. Here, Ms. Burrell has sufficiently alleged that she was harassed by supervisors and that her employer failed to take sufficient remedial action in response to her complaints. *See, e.g.*, Am. Compl. ¶¶ 44, 81, 91, 127.

Accordingly, the Court declines to dismiss Ms. Burrell's hostile work environment claims at this stage of the proceedings.

### C. Retaliation Claim

Defendants next argue that Ms. Burrell's retaliation claims fail because she has not alleged any "materially adverse action" taken by the District or Mr. Cipullo. Defs.' Mem., ECF No. 12-1 at 20. According to defendants, "[a]lthough unpleasant and potentially embarrassing to Plaintiff, criticisms from coworkers on email and social media are not materially adverse actions." *Id.* at 21. Defendants also insist that the denial of Ms. Burrell's transfer request and the denial of her request for medical leave are not materially adverse actions. *Id.* at 22.

To state a claim for retaliation under Title VII and the DCHRA, a plaintiff must allege that she suffered a "materially adverse action" because she "brought or threatened to bring a discrimination claim." *See Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). A retaliatory act is "materially adverse" if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). For example, depending on the context, "[a] schedule change in an employee's work schedule" or exclusion of an employee "from a weekly

training lunch" could deter a reasonable employee from complaining and therefore might be actionable. *Id.* at 69.

Here, Ms. Burrell alleges a number of retaliatory actions taken after she complained about Ms. Shepard's video. For example, she claims that her coworkers refused to speak to her, "making it very difficult for her to perform her assigned tasks." Am. Compl., ECF No. 10 ¶ 56. Some coworkers purportedly made derogatory comments about Ms. Burrell on social media, while another sent an email to Superior Court employees questioning "the heart and motive" of any person who would report Ms. Shepard. *Id.* ¶¶ 76-79, 82. Ms. Burrell contends that these incidents made her "fearful of speaking out about any further incidents of racial harassment, bullying and discrimination." *Id.* ¶ 100. She further claims that Human Resources and Mr. Cipullo refused to take any corrective or disciplinary actions against those harassing Ms. Burrell. *Id.* ¶¶ 84, 86-87.

Ms. Burrell further claims that Ms. Shepard, who continued to be her supervisor, refused to speak with her, thereby denying her "access to a Branch Chief." *Id.* ¶ 57. According to Ms. Burrell, the ability to speak to her supervisor one-on-one is critical because it "allows employees the benefit of recognition, allows their ideas and suggestions to be heard, and strengthens their professional network within the work place."

*Id.* ¶ 58. In addition, Ms. Burrell claims that, whenever she asked for assistance with or clarification of her workplace duties, Ms. Shepard would "admonish, mock and belittle her." *Id.* ¶ 115. Despite this behavior, Mr. Cipullo refused to grant Ms. Burrell's request to be transferred or reassigned to another division in Superior Court. *Id.* ¶ 97.

Finally, Ms. Burrell claims that Human Resources denied her request for leave based on work-related stress. *Id.* ¶ 102. She further claims that Mr. Cipullo denied her request for full medical leave after she suffered injuries in a car accident. *Id.* ¶¶ 122-23. She contends that denial of her request for full medical leave "detrimentally impacted her recovery" from her injuries. *Id.* ¶ 124.

Here, construing the allegations in the light most favorable to Ms. Burrell, the Court cannot conclude that she has not alleged any adverse action as a matter of law. As other courts in this Circuit have explained, under certain circumstances, a denial of leave can constitute materially adverse action. *See, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 90 (D.D.C. 2009) (declining to dismiss retaliation claim where denial of leave had a financial impact on plaintiff); *Hussain v. Principi*, 344 F. Supp. 2d 86, 104 (D.D.C. 2004) ("denial of medical leave might each be an adverse action in some circumstances").

Moreover, as Ms. Burrell notes, a hostile work environment can give rise to a retaliation claim under Title VII. *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). To prevail on such a claim, a plaintiff must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" of such sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment." *Id.* (citation and internal quotation marks omitted).[2] Here, for the same reasons that her hostile work environment claim survives, the Court finds that Ms. Burrell's claim for retaliation based on hostile work environment also survives. Therefore, the Court declines to dismiss Ms. Burrell's retaliation claims.[3]

---

[2] It is unclear whether the same standard applies to both discriminatory and retaliatory hostile work environment claims. *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79-82 (D.D.C. 2013) (explaining that courts in our circuit "do not appear to have reconsidered the retaliatory harassment standard in light of *Burlington Northern*," finding that "[a] good argument" could be made that courts should do so, but applying the older, more stringent standard set forth in *Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006)). Because the Court concludes that Ms. Burrell's claim survives under the standard set forth in *Hussain*, it would necessarily survive under the less stringent standard articulated in *Burlington Northern*.

[3] To the extent Ms. Burrell alleges a claim for constructive discharge, *see* Pl.'s Opp'n, ECF No. 13-1 at 21, the Court finds that she has not stated a claim. After all, a claim for constructive discharge requires "something more" than a hostile work environment claim alone. *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Bishopp v. Dist. of Columbia*, 788 F.2d 781, 790 (D.C Cir. 1986) ("A finding of constructive discharge requires a finding of intentional discrimination ***plus***

**D. Section 1983 Claims**

To state a claim under section 1983, a plaintiff must establish that she was deprived of "a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Ms. Burrell alleges that she was denied her right to be free from racial discrimination under the Equal Protection Clause of the Fifth Amendment. *See* Am. Compl., ECF No. 10 ¶¶ 187–212. A plaintiff may allege an equal protection violation if "he or she received differential treatment by the government due to membership in a protected class, such as one based on race, national origin, or gender." *Kelley v. Dist. of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012).

To state a claim for intentional discrimination under the Equal Protection Clause, a plaintiff "must plead and prove that the defendant acted with discriminatory purpose." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "[P]urposeful discrimination requires more than 'intent as volition or intent as awareness of

---

a finding of aggravating factors that suggest that the complainant was driven to quit.") (emphasis added). "The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination." *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006). The allegations here do not point to any "aggravating factors" and do not rise to the level of "extreme mistreatment."

consequences.' It instead involves a decision maker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Id.* at 676-77 (citation and internal quotation marks omitted).

Defendants argue that Ms. Burrell's constitutional claims against Ms. Shepard and Mr. Cipullo fail because she has not sufficiently alleged that they engaged in "purposeful discrimination" and, in any event, they are entitled to qualified immunity. Defendants also argue that Ms. Burrell's claims against the District of Columbia fail because she has not alleged sufficient facts to state a claim for municipal liability under section 1983. Defs.' Mem., ECF No. 12-1 at 23-27. The Court evaluates each argument in turn.

### 1. Ms. Burrell's Section 1983 Claims Against the Individual Defendants

To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and must show that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Ms. Burrell argues that she has sufficiently pled her section 1983 claims against Mr. Cipullo and Ms. Shepard because she alleges that they both intentionally discriminated against

her on the basis of her race. Pl.'s Opp'n, ECF No. 13-1 at 25-27. Defendants argue that Ms. Burrell's claims must be dismissed because she "has not alleged any constitutional violation" committed by either defendant. Defs.' Mem., ECF No. 12 at 24-25. For the reasons set forth below, the Court finds that, although plaintiff's section 1983 claim against Mr. Cipullo must be dismissed, her claim against Ms. Shepard survives.

With respect to Mr. Cipullo, the Court finds that plaintiff's allegations are insufficient to set forth a claim based on an equal protection violation. Plaintiff makes a series of allegations relating to Mr. Cipullo's history of acting with racial animus toward employees that he supervised. *See, e.g.*, Am. Compl., ECF No. 10 ¶ 104 (claiming that "numerous Superior Court Criminal Division employees filed internal grievances and EEOC Charges of Discrimination against Cipullo, which alleged racial discrimination and a hostile work environment"); *id.* ¶ 107 (alleging that "Cipullo prevented an African-American female employee from being able to leave her office while he aggressively yelled at her"); *id.* ¶ 108 ("Cipullo has ordered African-American employees to attend and perform menial tasks at judicial conferences, while similarly-situated Caucasian employees have either been exempt or given professional roles at the conferences"); *id.* ¶ 109 ("Cipullo has assigned African-American female employees offices that are under construction,

while giving similarly-situated non-African- American employees offices that were not under construction"). She does not, however, allege that Mr. Cipullo took any action *with respect to her* that was animated by racial bias. *See, e.g.*, *Rodriguez v. Dist. of Columbia*, 118 F. Supp. 3d 132, 138 (D.D.C. 2015) (dismissing the plaintiff's section 1983 equal protection claim because she did not allege any facts suggesting that "the individual defendants took action against her because of, not merely in spite of, her membership in a protected class").

In her opposition, Ms. Burrell points to Mr. Cipullo's decision to deny her request for a transfer, his failure to take action against Ms. Shepard for the substantiated complaint related to the video incident, his expression of agreement with another employee who stated that it was wrong that Ms. Burrell had reported Ms. Shepard, and his failure to take actions against Ms. Burrell's coworkers for their purportedly harassing behavior. Pl.'s Opp'n, ECF No. 13-1 at 26. As an initial matter, the complaint states that Mr. Cipullo did take *some* action in response to the video incident: he called a meeting to discuss the incident and he transferred Ms. Shepard to a different position for a period of time. *See* Am. Compl., ECF No. 10 ¶¶ 64-65. In her amended complaint, plaintiff does not allege that any of the other actions taken by Mr. Cipullo were "because of" her race. *See, e.g.*, *Rodriguez*, 118 F. Supp. 3d at 139 ("There are

no factual allegations in the second amended complaint that connect plaintiff's race, national origin, or disability to the adverse employment decisions of which she complains.").

With respect to Ms. Shepard, however, the Court finds that plaintiff has sufficiently alleged that Ms. Shepard treated her differently from similarly-situated employees with a discriminatory intent or purpose. In particular, Ms. Burrell alleges that Ms. Shepard used racially derogatory language — i.e., "I hate ignorant black folk, they get on my nerve" — toward her in the course of filming the video on her cell phone. Am. Compl., ECF NO. 10 ¶¶ 29-38. In addition, Ms. Burrell alleges that, subsequent to the video incident, Ms. Shepard refused to speak with her, ignored and isolated her, and would "admonish, mock, and belittle her." *Id.* ¶¶ 57, 60, 115. The use of racially-charged language, coupled with Ms. Shepard's alleged persistent harassment of Ms. Burrell, is sufficient to state a claim for a violation of the Equal Protection Clause. *Cf. Watson v. Div. of Child Support Servs.*, 560 F. App'x 911, 913 (11th Cir. 2014) (offensive or derogatory statements may violate equal protection guarantees if they "are so pervasive as to amount to racial harassment or are accompanied by some other conduct that deprives a person of the equal protection of the laws").

Defendants argue that, even if Ms. Burrell does state an equal protection claim, that claim would still fail because Ms.

Shepard is entitled to qualified immunity. Defs.' Mem., ECF No. 12-1 at 25-26. The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts approach qualified immunity claims through a two-step analysis: (1) whether the alleged facts show that the individual's conduct violated a statutory or constitutional right; and (2) whether that right was clearly established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). When determining whether a right was "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

As set forth above, the Court concludes that Ms. Burrell has articulated a violation of her Fifth Amendment rights. Additionally, there can be no question that freedom from racial discrimination is "clearly established" under the Constitution. *See Caldwell v. Caesar*, 150 F. Supp. 2d 50, 60 ("Defendant Caesar does not claim he would be entitled to immunity if he is found to have discriminated against Plaintiff because of his race. Any such claim would be frivolous."). Accordingly, the

Court declines to dismiss plaintiff's section 1983 claim against Ms. Shepard on qualified-immunity grounds at this stage of the proceedings.

### 2. Plaintiff's Section 1983 Claims Against the District of Columbia

Finally, defendants argue that Ms. Burrell's section 1983 claim against the District of Columbia must be dismissed for failure to state a claim. Defs.' Mem., ECF No. 12 at 26-27.

A municipality "can be found liable under section 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in the original). The District, as a municipality, *see* D.C. Code § 1-102, is subject to liability under section 1983 only "when an official policy or custom causes the [plaintiff] to suffer a deprivation of [a] constitutional right," *Carter v. Dist. of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986).

A plaintiff may rely on four basic categories of municipal action in alleging that the municipality causes the constitutional violation: (1) express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4) deliberate indifference." *Hunter v. Dist. of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011). In addition, the municipal action must be the moving force behind the alleged

constitutional violation. *Carter*, 795 F.2d at 122 (citing *Monell*, 436 U.S. at 694); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject"). In cases like this one that do not involve express policies, a plaintiff must still allege a course of action deliberately pursued by the city, "as opposed to an action taken unilaterally by a nonpolicymaking municipal employee." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 829 (1985) (Brennan, J., concurring). The plaintiff must also allege "an affirmative link between the [city's] policy and the particular constitutional violation alleged." *Id.* at 823 & n.8. Moreover, a city is not required "to take reasonable care to discover and prevent constitutional violations" but rather, must simply "not adopt a policy of inaction" when "faced with actual or constructive knowledge that its agents will probably violate constitutional rights." *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

Here, Ms. Burrell claims that the District has a "custom and policy" of racially discriminating against African-American Superior Court employees. Pl.'s Opp'n, ECF No. 13-1 at 28-29; Am. Compl., ECF No. 10 ¶ 202. She further alleges that the

District acted with "deliberate indifference" in not training its Human Resources department and supervisors in the Criminal Division "on investigating and responding to allegations of racial harassment and discrimination." Pl.'s Opp'n, ECF No. 13-1 at 28-29; *see also* Am. Compl., ECF No. 10 ¶¶ 204, 206. Despite these allegations, the Court finds that Ms. Burrell has not sufficiently pled that the District had a "policy of inaction" or acted with "conscious disregard for the consequences of their action" to trigger municipal liability. *Connick*, 563 U.S. at 61-62. To the contrary, Ms. Burrell acknowledges in her amended complaint that a number of actions were taken in response to her complaint about the video posted by Ms. Shepard. For example, on April 18, 2016, Ms. Shepard sent an e-mail about the incident to all Superior Court Criminal Division employees in which she stated that she took "full responsibility for [her] actions" and asked those who were offended to "forgive" her. Pl.'s Opp'n Ex. 1D, ECF No. 13-4 at 32. In that same email, Ms. Shepard also explained that she had "learned the hard way that there is a court policy that exists stating that we are prohibited from taking video and audio recording . . . without prior authorization" and that violation of the policy "can result in corrective action." *Id*. Two days later, Mr. Cipullo held a meeting with all of the employees in the Criminal Division to discuss the incident. Am. Compl., ECF No. 10 ¶ 64. At that

meeting, Mr. Cipullo explained that another employee would "replace Shepard" as Branch Chief. *Id.* ¶ 65; *see also id.* ¶ 91 ("the only remedial action that has been taken by Cipullo in connection with the substantiated bullying finding against Shepard was her temporary reassignment"). In addition, Ms. Burrell states that, on May 10, 2016, a representative from the Human Resources Division informed her that her bullying complaint against Ms. Shepard had been "substantiated" and that actions would be take in accordance with court policy. *Id.* ¶¶ 88-89.

Given these allegations, the Court finds that plaintiff has not pled that the District adopted a "policy of inaction" when faced with knowledge that its agents may be violating constitutional rights. Accordingly, the Court will **DISMISS** Count VI of the amended complaint against the District for failure to state a claim.[4]

---

[4] The Court also finds that plaintiff has not sufficiently alleged a "pattern" of constitutional violations required to state a section 1983 claim against a municipality. Although Ms. Burrell alleges that the District's failure to train employees "on investigating and remedying racial harassment" led to "racial harassment and discrimination permeating the workplace," Pl.'s Opp'n, ECF No. 13-1 at 29, her factual allegations in this regard primarily focus on her own experience after reporting the video filmed by Ms. Shepard, *see, e.g.*, Am. Compl., ECF No. 10 ¶ 206 (pointing to her supervisor's "vocal agreement" that the video should not have been reported and the failure of supervisors to take action to protect plaintiff after she reported the video or to address plaintiff's coworkers who made derogatory remarks). This falls short of pleading a

**IV.   CONCLUSION**

For the reasons set forth in this Memorandum Opinion, the defendants' motion to dismiss Ms. Burrell's amended complaint is **GRANTED IN PART AND DENIED IN PART**. A separate Order accompanies this Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **July 27, 2018**

---

"pattern of similar constitutional violations" needed to state a claim under either a "custom or policy" or "deliberate indifference" theory. *See., e.g.*, *Patrick v. Dist. of Columbia*, 179 F.Supp.3d 82, 87 (D.D.C. 2016)(a plaintiff "sufficiently pleads a § 1983 [custom or policy] claim when his complaint refers to specific incidents that plausibly show a custom or pattern of behavior"; *Connick*, 563 U.S. at 62 (a pattern of violations "by untrained employees" is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train")(citation and internal quotation marks omitted).